UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| INDUSTRIAL KILN AND DRYER GROUP INC,<br><br>Plaintiff,<br><br>v.<br><br>ASH GROVE CEMENT COMPANY,<br><br>Defendant. | CASE NO. C23-0814-KKE<br><br>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |

This case presents a dispute between the owner of a cement manufacturing plant and its contractor over a project to repair sections of the plant's aging cement kiln. The contractor, Plaintiff Industrial Kiln and Dryer Group ("Industrial Kiln"), sued to recover payments for invoices it claims the plant's owner, Defendant Ash Grove Cement Company ("Ash Grove"), wrongfully refused to pay. Ash Grove then countersued Industrial Kiln, claiming damages for business interruption and direct costs it claims to have incurred as a result of Industrial Kiln's defective work on the kiln.

Both parties moved for summary judgment seeking dismissal of all or a portion of the other party's claims. And Industrial Kiln also cross-moved for summary judgment on its own affirmative claims.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 1

For the following reasons, the Court finds that the parties' contract sets a maximum, not-to-exceed price above which Industrial Kiln was not entitled to be paid for work on the project without a written change order. Yet there is no genuine dispute that no written change order authorized the additional compensation Industrial Kiln seeks to recover. Because the contract expressly disclaims unwritten waivers of the written change order requirement, the Court rejects Industrial Kiln's waiver arguments. And because the contract governs, Industrial Kiln cannot recover in unjust enrichment. Finally, the Court finds that genuine issues of fact preclude summary judgment with respect to Ash Grove's counterclaims and its available remedies.

Accordingly, the Court will grant Ash Grove's motion for summary judgment and deny Industrial Kiln's cross-motion.

## I.   BACKGROUND

Ash Grove is a manufacturer of cement and other similar materials with operations across the United States, including Seattle, where Ash Grove runs a cement production facility. Dkt. No. 47 ¶ 2. The central component of the Seattle plant is a large rotary kiln that operates continuously—producing materials 24 hours a day, seven days a week—unless shut down for maintenance or repairs. *Id.* The kiln resembles a horizontal cylinder, measuring 308 feet in length and 15 feet in inside diameter. *Id.* Because it sits at a slight angle, locations along the kiln are referred to as being "uphill" or "downhill" of one another. *See* Dkt. No. 60-2 at 7. During production, the kiln is designed to rotate around its long axis, uniformly heating and mixing the material inside as it shifts toward the downhill end of the kiln.

### A.   The Agreement to Repair Ash Grove's Kiln

In October 2021, Ash Grove issued a request for proposals ("RFP") to various contractors, including Industrial Kiln, to perform repairs to the kiln—in particular, replacing three sections of the kiln's shell around the downhill end. Dkt. No. 47 ¶ 4; *id.* at 6. Industrial Kiln responded with

a proposal later that month, and the parties engaged in multiple rounds of discussions, site visits, and technical meetings. *Id.* ¶ 4; *id.* at 44–54. Following these discussions, Industrial Kiln submitted a revised proposal in January 2022. *Id.* at 26.

The original plan was for Industrial Kiln to align, weld, and install three new shell sections, the manufacture of which Ash Grove had arranged for from a third party. Dkt. No. 47 at 26–27. Industrial Kiln's January 2022 proposal described the scope of its proposed work; outlined the anticipated schedule, including the estimated shutdown time; and quoted a total budget price. *Id.* at 26–37. The proposal estimated the work would take 31.5 days to complete, including 25.5 days of kiln downtime, and cost $1,149,450, which Industrial Kiln would bill on a time and materials basis. *Id.* at 27, 33. Industrial Kiln also represented that its welds would conform to industry standard based on the "AWS D1-1 standard." *Id.* at 28.

In May 2022, Ash Grove and Industrial Kiln executed a formal contract (the "Purchase Order"), detailing the terms of the parties' agreement. Dkt. No. 47 at 39–43. Under a section describing the work, the Purchase Order incorporated the RFP, Industrial Kiln's proposal, and notes from certain meetings and project discussions that occurred in late 2021. *Id.* at 39. Consistent with Industrial Kiln's proposal, the Purchase Order listed a total budget price of $1,149,450. *Id.* at 40. It also required Ash Grove to pay a "30% [d]ownpayment" upon signing the agreement and provided, "[t]his is a Time & Material (NOT TO EXCEED) contract. Please notify the buyer [Ash Grove] when you have reached 80% incurred if your EOC[1] is greater than the value of this [Purchase Order]." *Id.* at 39.

---

[1] The Purchase Order does not define "EOC." But Industrial Kiln explains—and Ash Grove does not dispute—that EOC typically refers to elements of cost, which includes expenses such as labor, materials, and administrative costs. Dkt. No. 57 at 7 n.4.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 3

Attached to the Purchase Order was a list of general terms and conditions, which the Purchase Order explained were "negotiated, amended[,] and agreed to by the parties" and "incorporated by reference as an inherent part of the Purchase Order." Dkt. No. 47 at 40, 41–43. Pursuant to those terms, Industrial Kiln represented that it would complete the work in a "timely" and "workmanlike" manner and would not "interfere with or … interrupt" the facility's operations without prior permission from Ash Grove's Seattle plant manager. *Id.* at 41. The terms also included a "change orders" clause, which provided:

> No verbal instruction or agreement, action, conduct, omission, prior failure[,] or course of dealing by [either party] will act to waive, modify, change, or alter the requirement that to change matters such as an individual project's scope, price, schedule[,] or performance guarantees must be [sic] in writing and signed by [both parties] (i.e., no "constructive" change orders shall be valid).

*Id.* Finally, the contract contained provisions limiting the availability of certain types of damages, including consequential damages and damages "for the correction of any nonconforming work, materials, services[,] or goods[.]" *Id.* at 43.

## B.    The Repair Project

Industrial Kiln mobilized its crews to Seattle on May 19, 2022, and was on site to begin work the next day. Dkt. No. 59-8 at 2–9, Dkt. No. 70 ¶ 11. However, the parties quickly determined they would have to reduce the project's scope due to defects in two of the kiln sections fabricated by Ash Grove's third-party manufacturer. Dkt. No. 47 ¶ 8, Dkt. No. 60 ¶ 5. Accordingly, the parties agreed to adjust Industrial Kiln's scope from replacing all three sections to replacing just one. Dkt. No. 47 ¶ 8, Dkt. No. 60 ¶ 5. They did not execute a formal written change order to memorialize this change. Dkt. No. 60 ¶ 5. Nor did they reduce the budget price to account for the narrower scope of work. Dkt. No. 47 ¶ 8.

With this adjustment, Industrial Kiln proceeded with replacing the single kiln section. Under its proposal, Industrial Kiln's crews would maintain continuous operations by working two

12-hour shifts every day. Dkt. No. 47 at 27. Hoping to continue supplying customers during the outage, Ash Grove had, by this time, stockpiled product based on the time the kiln was expected to be nonoperational. Dkt. No. 70 ¶ 12. Over the following weeks, however, the project hit several snags that delayed the kiln returning to service by over a month. *Id.* ¶ 28, Dkt. No. 60 ¶ 20.

While many facts are undisputed, the parties generally dispute the causes of the delay and who was responsible. According to Mike Begley, Ash Grove's engineering manager for Seattle, Industrial Kiln made decisions during the cutting process that resulted in defects and, ultimately, cascading impacts to the project's schedule. First, Begley contends that Industrial Kiln established its "reference line" too far from where the crew intended to initiate the cut, making the cut difficult to execute precisely. Dkt. No. 70 ¶ 15. Second, Begley faults Industrial Kiln for using a cutting track device that did not fully extend around the circumference of the kiln and thus required crew members to manually complete the cut without the precision of the track. *Id.* According to Begley, this resulted in excessive gaps between the new kiln section and the existing shell, which meant the shell had to be re-beveled prior to welding, delaying the work. *Id.* ¶ 18; *id.* at 50–51. Begley also contends the uneven cut led to ongoing alignment issues that Industrial Kiln tried to address with additional hardware and welds. *Id.* ¶¶ 18–20. These remedial measures, however, created undesirable stress on the kiln shell, leading to further installation problems. *Id.* ¶ 21.

Industrial Kiln, on the other hand, ascribes the delay to misshaped fabrication of the kiln shell and "unreasonable" requirements imposed by Ash Grove and its two consultants—FLS, which provided technical consulting, and MISTRAS Group, Ash Grove's third-party inspector. *See* Dkt. No. 57 at 10, 20. For instance, Industrial Kiln contends that Ash Grove and FLS required additional hardware that caused stress to the shell by "dictat[ing] parameters" for the "gap and offset" measurements for aligning the joints. Dkt. No. 60 ¶ 20. Industrial Kiln also claims that MISTRAS "imposed unreasonable heat requirements for the shell welds." Dkt. No. 57 at 10. And

it contends that Ash Grove increased the number of "strongbacks"—a type of hardware for securing joints during welding—above what the original design required. Dkt. No. 60 ¶ 20.

By June 15, 2022, Industrial Kiln had installed the additional hardware and temporary welds to secure the new kiln section in place and was ready to measure the kiln's "run-out"—i.e., how far the new section deviated from its axis during rotation. Dkt. No. 70 ¶ 22. This step required rotating the kiln with the joint hardware in place. *Id.* Once the kiln began to rotate, however, the hardware failed, causing the new kiln section and a part of the existing kiln—collectively weighing about a million pounds—to drop 1.5 inches and twist. *Id.* ¶ 23. The kiln drop required the parties to stop work for several days to secure the kiln, evaluate the damage, and develop a new plan to stabilize the kiln and move forward with installation. *Id.* Industrial Kiln's daily project logs reflect that its onsite manager attributed the fall to Ash Grove and FLS's requirement "to make an egg shaped shell" round—referring to defects in the shell's fabrication—which resulted in stress to the joints that discharged during rotation. Dkt. No. 59-8 at 111. Ash Grove's expert, Robert S. Vecchio, on the other hand, attributed the fall to Industrial Kiln's failure to submit a written welding sequence and distortion control program that might have mitigated the alignment issues. Dkt. No. 66 at 16.

In early July—already past the date the plant had been scheduled to reopen—Industrial Kiln was able to begin the final welding process. Dkt. No. 70 ¶ 26, Dkt. No. 59-8 at 176. As welding proceeded, however, Ash Grove repeatedly raised concerns with Industrial Kiln about weld temperatures being too low. Dkt. No. 70 ¶ 27, Dkt. No. 60 ¶ 20. According to Begley, issues with weld temperature, as well as insufficient supply of welding hoses, contributed to welding being further delayed into mid-July. Dkt. No. 70 ¶ 28. Industrial Kiln, on the other hand, argues that Ash Grove's weld temperature demands were unreasonable (Dkt. No. 57 at 10), and its daily

progress logs state that Ash Grove's standards for polishing the weld seams went "way beyond normal practice[,]" contributing to the delay (Dkt. No. 59-8 at 241).

Industrial Kiln completed internal welding on July 15, 2022. Dkt. No. 70 ¶ 30. Several days later, however, Ash Grove's inspector, MISTRAS, determined that multiple weld locations failed to meet the weld standard the parties had agreed to. *Id.*; *see also id.* at 161–63 (subsequent inspection referencing MISTRAS findings). Industrial Kiln disputed this finding and retained a third-party inspector to perform a second inspection. *Id.* ¶ 31. But that inspection confirmed the defects identified by MISTRAS and concluded that the weld areas had been properly rejected. *Id.* at 162–63.

By July 19, 2022, Ash Grove had made plans to phase out Industrial Kiln and hand off the remaining work, which included repairing the welds identified by MISTRAS and installing remaining kiln hardware, to other contractors. Dkt. No. 70 at 149. On July 21, Ash Grove instructed Industrial Kiln to remove its crews from the site. Dkt. No. 60 ¶ 20, Dkt. No. 60-8 at 2. And four days later, Begley informed Industrial Kiln that Ash Grove would not be requesting further assistance in repairing the weld defects or any other work. Dkt. No. 60-9 at 2. The kiln was ultimately shut down for 70 days during the project, roughly double the original estimate. Dkt. No. 75-1 at 34.

## C.    Industrial Kiln's Invoices

Throughout the course of the project, Industrial Kiln billed Ash Grove weekly for its services. Dkt. No. 47 ¶ 9, Dkt. No. 60 ¶ 13. At first, Ash Grove paid the invoices. Dkt. No. 47 ¶¶ 8, 10; Dkt. No. 60 ¶ 19. The parties also executed several written change-of-work plans for specific items of additional work, each of which listed a "T&M Rate Sheet" price for the changed scope. *See* Dkt. No. 58-1 at 3–9, Dkt. No. 59-3 at 3, Dkt. No. 59-4 at 3. Except for one change-of-work plan that involved moving a portion of the kiln shell, which Ash Grove rejected (and

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 7

Industrial Kiln never performed), Ash Grove approved the changes. Dkt. No. 47 ¶ 7, Dkt. No. 57 at 12 n.9. In total, Ash Grove paid Industrial Kiln $1,841,210.46—more than the budget price listed on the Purchase Order, the sum of the accepted change-of-work plans, and the 30% downpayment, which Ash Grove contends was never credited toward subsequent invoices. Dkt. No. 47 ¶ 10, Dkt. No. 60 ¶ 19.

Industrial Kiln, however, had submitted invoices for more than $3.5 million. Dkt. No. 47 ¶ 9, Dkt. No. 60 ¶ 12. Ash Grove refused to pay the last five invoices dated between July 1 and August 12, 2022, which totaled approximately $1.7 million. Dkt. No. 60 ¶ 12. These invoices were for work that occurred after June 19, 2022, by which time the project had exceeded its budget and schedule. Dkt. No. 60-10 at 2; *see also* Dkt. No. 58-8 at 4 (reflecting 99.5% of budget spent by June 9), Dkt. No. 59-8 at 124 (listing "Job Grand Total" as $1.5 million by June 19, 2022), Dkt. No. 60 ¶ 14 (cost overruns had become apparent by early July 2022).

Internal emails indicate that, at least by June, Ash Grove employees anticipated the project exceeding the budget but intended not to pay for the excess costs. *See* Dkt. No. 75-2 at 2. At the same time, Ash Grove wished to delay a dispute with Industrial Kiln while the project was ongoing by holding back over-budget invoices. In one email, for instance, an Ash Grove employee stated, "I agree we should not pay [Industrial Kiln] anymore [sic] than the original $1.4 M estimate and should wait until the last day it is due." *See* Dkt. No. 75-3 at 2. In another, an employee emailed Ash Grove's billing department about a 15-day late invoice, explaining, "[i]n this case[,] we are holding payments until absolutely necessary – as we will be turning this over [to] legal as soon as the kiln gets turned back to Ash Grove." Dkt. No. 75-5 at 2.

In mid-July, an Industrial Kiln employee and its President, Randall Young, emailed representatives at Ash Grove to inquire about unpaid invoices. Dkt. No. 60 ¶¶ 15–17. In response, Ash Grove employees gave generic answers, such as: "Working thru the process you should have

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 8

something tomorrow"; "Working on it. Stay tuned."; and "I will be back tomorrow and work it thru the system." Dkt. Nos. 60-15, 60-16, 60-17.

### D.      Procedural History

On May 31, 2023, Industrial Kiln sued Ash Grove for failing to pay the remaining invoices and wrongfully terminating the contract. Dkt. No. 1. Industrial Kiln's complaint asserts claims for breach of contract, breach of the duty of good faith and fair dealing, and unjust enrichment. *Id.* ¶¶ 28–43. Ash Grove responded with counterclaims for breach of contract, warranty, and indemnity, seeking to recover damages for its lost business during the extended kiln shutdown and its costs to repair Industrial Kiln's welds and complete the work. Dkt. No. 12 ¶¶ 20–33. Ash Grove later filed an amended answer adding allegations concerning damage caused by the kiln drop. Dkt. No. 26.

Ash Grove moved for summary judgment, seeking dismissal of Industrial Kiln's claims. Dkt. No. 46. Industrial Kiln responded (Dkt. No. 52) and separately filed a cross-motion for summary judgment (Dkt. No. 61). The cross-motion seeks (1) judgment in Industrial Kiln's favor on its breach of contract and duty of good faith claims and (2) dismissal of Ash Grove's counterclaims or, alternatively, a ruling that Ash Grove's remedies are limited by certain provisions in the Purchase Order. *Id.* The Court heard oral argument on May 7, 2026. Dkt. No. 78. And both motions are now ripe for consideration.

## II.   DISCUSSION

### A.      Legal Standard

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden to show the absence

of a genuine issue of material fact and that it is legally entitled to prevail. *Celotex*, 477 U.S. at 323. If the moving party seeks summary judgment on its own affirmative claim—i.e., a claim on which it will bear "the burden of persuasion at trial"—it "must establish beyond controversy every essential element" of its claim. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (citation modified). Once the moving party carries its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation modified).

The court construes the evidence and draws "reasonable inferences in the light most favorable to the [nonmoving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation modified). When resolving cross-motions, the court will "evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006) (quoting *ACLU v. City of Las Vegas*, 333 F.3d 1092, 1096–96 (9th Cir. 2003)).

Courts may interpret an unambiguous contract at summary judgment "even if the parties dispute the legal effect of a certain provision." *Mayer v. Pierce Cnty. Med. Bureau, Inc.*, 909 P.2d 1323, 1326 (Wash. Ct. App. 1995) (quoting *Voorde Poorte v. Evans*, 832 P.2d 105, 107 (Wash. Ct. App. 1992)). A contract is unambiguous if either "its interpretation does not depend on the use of extrinsic evidence" or "only one reasonable inference can be drawn from the extrinsic evidence." *Tanner Elec. Coop. v. Puget Sound Power & Light Co.*, 911 P.2d 1301, 1310 (Wash. 1996).

## B.    The Motions on Industrial Kiln's Claims

Both parties seek summary judgment in their favor on Industrial Kiln's breach of contract and duty of good faith claims. And Ash Grove also seeks dismissal of Industrial Kiln's unjust enrichment claim. Ash Grove's principal argument is that the Purchase Order sets a maximum

"not-to-exceed" price and requires written change orders to enlarge the project's budget. According to Ash Grove, Industrial Kiln has been paid all that it bargained for and cannot recover more under any of its legal theories. Industrial Kiln disputes this interpretation of the Purchase Order; contends that Ash Grove approved the uncompensated work and should pay for it; and argues, in the alternative, that Ash Grove either waived the written change order requirement or, if not, is liable under unjust enrichment.

The Court agrees with Ash Grove's interpretation of the Purchase Order and finds that no genuine issues of fact exist that might entitle Industrial Kiln to recover more than the contract provides, which Industrial Kiln has already been paid.

1. The Purchase Order requires written change orders to increase the "not-to-exceed" price.

Industrial Kiln's claims depend on the interpretation of two provisions in the Purchase Order, which the Court will refer to as the "not-to-exceed" clause and the "change orders" clause. *See* Dkt. No. 47 at 39, 41. In interpreting contracts, Washington courts focus "on the objective manifestations of the agreement" and seek to ascertain the intent of the parties from "the reasonable meaning of the words used." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005). The court will give contract language "its ordinary and common use" and will not construe a term "so as to defeat its plain and obvious meaning." *Mains Farm Homeowners Ass'n v. Worthington*, 854 P.2d 1072, 1074–75 (Wash. 1993). If the court can determine intent "from the actual words used" in the contract, the parties' "subjective intent … is generally irrelevant[.]" *Hearst Commc'ns*, 115 P.3d at 267.

The Purchase Order's not-to-exceed clause authorized Industrial Kiln to bill for its time and materials, but only up to a maximum total budget for the project. It states, "[t]his is a Time & Material (NOT TO EXCEED) contract" and lists the "[g]rand [t]otal" price as $1,149,450. Dkt.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 11

No. 47 at 39–40.  The contract then instructs Industrial Kiln to "notify [Ash Grove] when you have reached 80% incurred if your [elements of cost are] greater than the value of this [Purchase Order.]"  *Id.* at 39.

In other words, Ash Grove agreed to pay for the time spent by Industrial Kiln's crew members on the project and for the necessary materials; but it capped billings at just over $1 million.  At oral argument, Industrial Kiln acknowledged that the contract placed the burden on it to track its costs and inform Ash Grove when it reached 80% of the budget.  But the contract left it to the parties to determine the appropriate course of action in that circumstance—it did not require a modification of the not-to-exceed price or allow Industrial Kiln to automatically continue billing in excess of the cap.

This arrangement reflects a type of "guaranteed maximum price" term "commonly" used "in conjunction with … time-and-material contracts."  2 PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., BRUNER & O'CONNOR ON CONSTRUCTION LAW § 6:112 (Jan. 2026 ed.); *see also HDR Env't, Operations & Constr., Inc. v. Deason*, No. 15CV1402 JAH (NLS), 2018 WL 1627229, at *2, *7 (S.D. Cal. Mar. 29, 2018) (finding contract providing compensation "on the basis of Time and Materials not to exceed ... $515,910.96" was a guaranteed maximum price contract).  Under such an arrangement, the contractor "assumes the risk of the costs exceeding [the] maximum price" because, once that price is reached, "the contractor receives no further compensation" absent a waiver or modification of the maximum price term.  2 BRUNER & O'CONNOR ON CONSTRUCTION LAW § 6:112; *see also Madera Irrigation Dist. v. Hancock*, 985 F.2d 1397, 1402 (9th Cir. 1993), *as modified* (Mar. 8, 1993) ("When parties contract for a price not to exceed a certain dollar figure, that necessarily carries the implication that the seller bears the risk that its costs will exceed that ceiling."); *Lauth Grp., Inc. v. Sygma Network, Inc.*, No. CV 07-07808 GAF (AGRx), 2009 WL 10669362, at *7 (C.D. Cal. Mar. 5, 2009) (explaining that a guaranteed maximum price contract

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 12

by its "very nature … discloses an objective intent to require preapproval of all costs exceeding the" price ceiling).

The Purchase Order's not-to-exceed clause must be read in conjunction with the change orders clause, which limits how the parties could make changes to important terms, including price. That provision states, as relevant, "[n]o verbal instruction or agreement, action, conduct, omission, prior failure[,] or course of dealing by [either party] will act to waive, modify, change, or alter the requirement that" changes to "an individual project's … *price* … must be in writing and signed by [both parties.]" Dkt. No. 47 at 41 (emphasis added). In short, this clause requires a written change order to increase the not-to-exceed price.

Washington law generally requires contractors to follow such procedural provisions absent a waiver by the other party. *Mike M. Johnson, Inc. v. County of Spokane*, 78 P.3d 161, 167–68 (Wash. 2003). Thus, "failure to comply with the requirements of [a] change order provision is fatal to a later claim for compensation based on extra work." *Clevco, Inc. v. Mun. of Metro. Seattle*, 799 P.2d 1183, 1186 (Wash. 1990) (emphasis omitted) (citing *Brady Contracting Co. v. W. Manchester Twp. Sewer Auth.*, 508 A.2d 1287 (Pa. Cmmwlth. Ct. 1986)).

While the parties executed several written change-of-work plans—i.e., change orders—over the course of the project, each pertained to specific, discrete changes to the scope of work.[2] For instance, certain change-of-work plans provided that Industrial Kiln would mobilize a support crew to the jobsite two days early, repair certain cracks in the kiln shell, and supply additional equipment for securing seams between welded kiln components. *See* Dkt. No. 58-1 at 4, 6–8; Dkt.

---

[2] Industrial Kiln contends these change-of-work plans were not "change orders" per the contract's change orders clause. Dkt. No. 57 at 11. But it fails to explain how the distinction between a "change-of-work plan" and a "change order" is anything but semantic. The change-of-work plans are "writings" that "change" the "project's scope" and "price"—just what the change orders clause envisions. Dkt. No. 47 at 41. Indeed, the change-of-work plans themselves contain a section labeled "*change order* description[.]" *E.g.*, Dkt. No. 58-5 at 4 (emphasis added).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 13

No. 58-3 at 4.  Another change-of-work plan reflected a $17,000 increase to total costs due to downtime caused by Ash Grove's generator failing.  Dkt. No. 58-1 at 9.  Yet another is a customer credit for the costs of a particular night shift (the record does not explain the reason for the credit).  Dkt. No. 58-6.  Each change-of-work plan includes a description of the additional work covered and lists a specific price (or credit) pursuant to the "T&M Rate Sheet Pricing[.]"[3]  *See* Dkt. No. 58-1 at 3–9, Dkt. No. 59-3 at 3, Dkt. No. 59-4 at 3.

The change-of-work plans reflect specific agreements to adjust the not-to-exceed price by the amounts listed on each plan—not, as Industrial Kiln suggests, an intention to jettison the guaranteed maximum price arrangement in favor of open-ended billing based on costs.  *See* Dkt. No. 57 at 19–20 (arguing the change-of-work plans allowed Industrial Kiln to bill for "the ultimate costs to complete the work").  Indeed, many of the change-of-work plans contain a notation that states, "Ash Grove acknowledges and approves this Change of Work Scope and the likely increase of the 'NOT TO EXCEED AMOUNT' stated on" the Purchase Order.  *E.g.,* Dkt. No. 58-4 at 2, Dkt. No. 58-5 at 4.  Email correspondence from Industrial Kiln's president to Ash Grove confirms this understanding, referring to the prices on the change-of-work plans as the "worst case scenario[.]"  Dkt. No. 59-2 at 2.  Considering this context and the Purchase Order's background pricing arrangement, the only reasonable conclusion is that the parties intended the prices listed

---

[3] In addition to the ten change-of-work plans in the record, Industrial Kiln's brief refers to two others, which are not in the record.  *See* Dkt. No. 57 at 13 (referring to change-of-work plans 11 and 12).  While Industrial Kiln's brief suggests these change-of-work plans (one of which was purportedly a customer credit) did not list a specific price, counsel's representations in a brief are not evidence.  *Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) ("[S]tatements of counsel are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment." (citation modified)).  Accordingly, the Court considers only the change-of-work plans in the record.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 14

on the change-of-work plans to reflect the applicable increase (or credit) to the not-to-exceed price.[4]

It follows that Industrial Kiln has already received all the compensation it bargained for (and then some). The sum of the prices listed on the change-of-work plans, excluding the customer credit and the rejected plan, is $284,067.[5] Adding that to the $1.14 million not-to-exceed price yields an adjusted budget of around $1.4 million—far less than the $1.8 million Ash Grove undisputedly paid Industrial Kiln. *See* Dkt. No. 47 ¶ 10, Dkt. No. 60 ¶ 18. Having received more than the sum of the original not-to-exceed price and the change-of-work plans, Industrial Kiln has no contractual right to further payment.

While it advances several arguments for overcoming the not-to-exceed clause and the change orders requirement, none is persuasive.

First, Industrial Kiln argues that the "terms and circumstances" of the contract make it "clear the Parties' intended all work to proceed on a time and materials basis given the tentative nature, scope[,] and duration of the" project. Dkt. No. 57 at 23–24. But Industrial Kiln does not identify evidence in the record that comes close to overcoming the contract's unambiguous language setting a maximum, not-to-exceed price. Its conclusory assertion that "the five [] incorporated Contract documents clearly illustrate[] the tentative schedule" and "nature" of the project (Dkt. No. 57 at 24) is not enough to defeat summary judgment. *See Lujan v. Nat'l Wildlife*

---

[4] Industrial Kiln insists otherwise, arguing the change-of-work plans "were executed on a T&M basis per the Rate Sheet—not a fixed basis—allowing [Industrial Kiln] to submit for payment the ultimate costs to complete the work." Dkt. No. 57 at 19–20. But while the price of the change-of-work plans may not have been fixed—i.e., the costs could have turned out lower than expected—there is no indication the parties intended to do away with the not-to-exceed structure of their arrangement.

[5] The Court calculated this sum as follows: $42,567 (CoWP # 1, Dkt. No. 58-1 at 4) + $118,000 (CoWP # 2, Dkt. No. 58-1 at 3) + $35,700 (CoWP # 4, Dkt. No. 58-1 at 6) + $35,700 (CoWP # 5, Dkt. No. 58-1 at 7) + $17,000 (CoWP # 6, Dkt. No. 58-1 at 9) + $11,700 (CoWP # 7, Dkt. No. 58-4 at 2) + $7,800 (CoWP # 8, Dkt. No. 58-5 at 4) + $15,600 (CoWP # 10, Dkt. No. 58-7 at 3).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 15

*Fed'n*, 497 U.S. 871, 888 (1990) (holding conclusory, non-specific assertions are insufficient to defeat summary judgment).

Industrial Kiln also points to emails by its operations director, Doug Dixon, which it claims reflect an understanding that the project was billable on an open-ended time and materials basis. But the emails are, at best, ambiguous on this point. In one, Dixon states that "[r]econciliation will be accomplished as the project approaches completion which is normal and customary with a Time & Material project." Dkt. No. 58-1 at 2. In the second, he explains that the change-of-work plans "are not precise in the potential cost to the project but represent the potential impact to the overall T&M final cost. … Consumables and labor are reconciled at the end of the T&M job." Dkt. No. 58-8 at 2. Neither email clearly suggests Dixon believed the contract was not subject to a maximum, not-to-exceed price. So, the fact (underscored by Industrial Kiln) that Ash Grove did not object to the emails says little about the parties' understanding of the not-to-exceed provision. *See* Dkt. No. 57 at 14. In any event, the Court "will not read ambiguity into the contract" based on subjective understandings of the agreement where the language itself "is unambiguous[.]" *Syrovy v. Alpine Res., Inc.*, 859 P.2d 51, 54 (Wash. 1993) (quoting *Jacoby v. Grays Harbor Chair & Mfg. Co.*, 468 P.2d 666, 670 (Wash. 1970)); *see also Badgett v. Sec. State Bank*, 807 P.2d 356, 361 (Wash. 1991) ("[A] course of dealing does not override express terms in a contract[.]").

Second, Industrial Kiln contends that a material dispute exists as to whether the work underlying the additional $1.7 million it seeks was within the scope of work Ash Grove "approved and directed[.]" Dkt. No. 57 at 24–26. But this line of argument misses the point: Without a written change order authorizing a price increase, it makes no difference whether the work was approved by Ash Grove or generally within the project's scope. When Industrial Kiln executed the Purchase Order, it accepted the risk that the project's costs would surpass the not-to-exceed

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 16

price.  Without a written change order increasing the price, Industrial Kiln cannot fault Ash Grove for insisting that Industrial Kiln finish the project at the price the parties agreed to.

Finally, Industrial Kiln contends, in the alternative, that Ash Grove waived the change orders clause by approving and directing the uncompensated work.  Dkt. No. 57 at 26, 30–31.  Under Washington law, a party may waive a contractual requirement "which is meant for its benefit, and may imply waiver through its conduct." *Mike M. Johnson*, 78 P.3d at 166.  "Waiver by conduct, however, 'requires unequivocal acts of conduct evidencing an intent to waive.'" *Id.* (quoting *Absher Constr. Co. v. Kent Sch. Dist. No. 415*, 890 P.2d 1071, 1074 (Wash. Ct. App. 1995)).

Here, Ash Grove's conduct falls well short of unequivocally waiving the change orders clause.  Industrial Kiln points to Ash Grove's "oral directives" to perform certain work (Dkt. No. 57 at 31) but cites no authority suggesting that a contract provision expressly prohibiting waivers by "verbal instruction" (Dkt. No. 47 at 41) can *itself* be waived by a verbal instruction (thus defeating the purpose of the provision).  And in any event, the Purchase Order only required a change order if Ash Grove's directives altered the "scope," "price," or "schedule" of the project (Dkt. No. 47 at 41), which Industrial Kiln acknowledges was not the case:  Rather, its principal argument is that the over-budget work was *within* the scope of the original contract and the approved change-of-work plans.  Dkt. No. 57 at 1, 3.  If so, then directing Industrial Kiln's in-scope work did not require a change order, and the fact that Ash Grove did so without one does not support waiver.[6]  To the contrary, the parties' repeated use of written change orders when they

---

[6] Industrial Kiln insists that Ash Grove knew there was no money left in the budget when it was providing direction about ongoing work.  Dkt. No. 57 at 19.  But under a not-to-exceed contract, it is the contractor, not the purchaser, that bears the risk of budget overruns.  *See Madera Irrigation Dist.*, 985 F.2d at 1402.  Ash Grove was entitled to insist on Industrial Kiln's performance notwithstanding that Industrial Kiln had already earned all the compensation it had bargained for.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 17

intended to alter the project's price refutes the notion that Ash Grove waived the change orders provision.

Industrial Kiln briefly contends that Ash Grove's acceptance of *unsigned* change orders supports waiver. Dkt. No. 57 at 30–31. But that, at best, suggests Ash Grove waived the signature requirement for those specific orders—not that it waived the change orders requirement altogether. Indeed, another clause of the Purchase Order provides that a failure to "insist on strict performance" of any term "will not be construed as thereafter waiving" the term "and the same will continue and remain in full force and effect as though no waiver had occurred" (absent a signed writing to the contrary). Dkt. No. 47 at 42. Industrial Kiln also points to the fact that the parties did not execute a change order when they reduced the project's scope from replacing three kiln sections to replacing one. But again, that supports, at best, a waiver of the requirement with respect to that particular change—not of the change orders requirement writ large.

In sum, the parties' contract established a maximum price and required price adjustments to be by written change order. The undisputed facts establish that Industrial Kiln never obtained a change order for the additional compensation it now seeks and that Ash Grove never waived the requirement. Because Industrial Kiln received all the compensation it was owed under the contract, Ash Grove is entitled to summary judgment on Industrial Kiln's breach of contract claim.

For the same reasons, Ash Grove is also entitled to summary judgment on the duty of good faith claim. The duty of good faith does not "obligate a party to accept a material change in the terms of its contract." *Badgett*, 807 P.2d at 360. Thus, "[a]s a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms." *Id.* (citation omitted). Here, Industrial Kiln received the benefit of its contract when it received all the compensation it bargained for (plus some). Ash Grove did

not violate the duty of good faith by continuing to demand Industrial Kiln's performance while refusing to pay more than the agreed price.[7]

### 2. Unjust enrichment is unavailable because the parties' contract governs.

Finally, Industrial Kiln presents unjust enrichment as an alternative theory of recovery. But it fails to present evidence supporting an essential element of this claim: that it performed work *outside* the scope of the parties' contractual arrangement.

Unjust enrichment permits a plaintiff to recover the value of services provided "absent any contractual relationship" when "notions of fairness and justice require it." *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008). Where "a valid express contract" exists, a party cannot "disregard the same and bring an action on an implied contract relating to the same matter, in contravention of the express contract." *Chandler v. Wash. Toll Bridge Auth.*, 137 P.2d 97, 103 (Wash. 1943); *see also Taie v. Ten Bridges LLC*, 568 F. Supp. 3d 1126, 1133 (W.D. Wash. 2021) ("[A]s a quasi-contractual remedy, unjust enrichment does not apply where there is 'a valid express contract' between the same parties covering the same subject matter." (citations omitted)).

Industrial Kiln's principal position is that the $1.7 million it seeks is for work "outlined in [its] Proposal and [in] approved [change-of-work plans.]" Dkt. No. 57 at 32. And it concedes that, if the Court agrees, the unjust enrichment claim fails. *Id.* (agreeing to voluntarily dismiss the unjust enrichment claim if the Court finds the work was within the scope of the contract). As detailed below, the undisputed record shows that Industrial Kiln's work was, in fact, governed by the parties' contract.

---

[7] Nor did Ash Grove's generic emails in response to Industrial Kiln's inquiries about the unpaid invoices violate the duty of good faith. While Ash Grove might have informed Industrial Kiln earlier that it did not intend to pay more than the not-to-exceed price, Industrial Kiln was not prevented from "obtain[ing] the full benefit of performance" as a result. *Badgett*, 807 P.2d at 360. As Industrial Kiln acknowledged at oral argument, the Purchase Order placed the responsibility for tracking the depletion of the budget on it—not Ash Grove. *See* Dkt. No. 47 at 39.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 19

Industrial Kiln identifies no evidence suggesting the $1.7 million at issue was for extra work, separate from the kiln repair project. To the contrary, its daily progress logs from the relevant period—June 20, 2022, onward—show that the unpaid work consisted of its continuous efforts to replace and weld the new kiln section. *See* Dkt. No. 59-8 at 128–249 (listing activities such as "[c]ontinue cutting new strongbacks for both seams"; "[c]ontinue crack repair at internal seam area"; "[c]ontinue[] to gouge, bevel, and clean on both seams"; "[s]tart uphill seam welding"; and "[c]ontinue to polish the seam area under direction of the welding inspector and Ash Grove"). This point is not in dispute: Industrial Kiln acknowledges that its over-budget work "was within the [project] proposal" and "prescribed as Project work[.]" Dkt. No. 57 at 19–20. That distinguishes this case from those cited in Industrial Kiln's brief, where contractors had performed *extra* work pursuant to an oral request for which they were able to recover in quantum meruit despite contractual change order requirements. *See CKP, Inc. v. GRS Const. Co.*, 821 P.2d 63, 72 (Wash. Ct. App. 1991) (awarding recovery in quantum meruit for "extra work arising outside and independent of the contract"); *Top Line Builders, Inc. v. Bovenkamp*, 320 P.3d 130, 134, 136 (Wash. Ct. App. 2014) (same where defendant "requested unforeseen modifications to the plans and specifications").[8]

Here, the over-budget work was undisputedly within the scope of the Purchase Order or the approved change-of-work plans. Accordingly, the parties' agreement governs, and Industrial Kiln's unjust enrichment claim fails.

---

[8] *Top Line Builders* also involved distinct contract language. While it generally required written change orders, the contract there expressly provided that the defendant could "verbally request additional work and in so doing" would "agree[] to pay the contractor for such work" (with a change order to follow). 320 P.3d at 133 n.1. Here, by contrast, the Purchase Order expressly disclaims verbal changes to the project's scope or price. Dkt. No. 47 at 41.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 20

The Court will therefore grant Ash Grove's motion for summary judgment, deny Industrial Kiln's cross-motion with respect to its affirmative claims, and dismiss Industrial Kiln's claims for breach of contract, breach of the duty of good faith and fair dealing, and unjust enrichment.

**C.    Industrial Kiln's Cross-Motion on Ash Grove's Claims**

Next, Industrial Kiln's cross-motion seeks dismissal of Ash Grove's counterclaims for breach of contract, breach of warranty, and breach of indemnity or, alternatively, an order limiting Ash Grove's available remedies.  The cross-motion relies on three provisions of the Purchase Order: a notice-and-cure clause, a limitation-of-remedies clause, and a limitation-of-damages clause.  Several aspects of the cross-motion also rely on Industrial Kiln's own standard terms and conditions, which Industrial Kiln contends are incorporated by reference into the Purchase Order.  The Court will begin by considering the incorporation by reference issue, before turning to the substance of the cross-motion.

    1.    Incorporation by reference

Industrial Kiln contends that the parties' agreement incorporates its standard terms and conditions as follows:  First, the Purchase Order expressly incorporates Industrial Kiln's project proposal by reference.  Dkt. No. 47 at 39.  And second, the proposal contains a hyperlink to the terms and conditions.  *Id.* at 37.  As described below, however, the Purchase Order's plain language disclaims additional terms referenced in Industrial Kiln's proposal.

Under Washington law, "incorporation by reference must be clear and unequivocal." *Navlet v. Port of Seattle*, 194 P.3d 221, 235 n.15 (Wash. 2008) (quoting *W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc.*, 7 P.3d 861, 865 (Wash. Ct. App. 2000)).  "The party claiming incorporation by reference bears the burden of proving it." *Sugaberry v. United Parcel Serv.*, No. 2:21-CV-00610-DGE, 2022 WL 910945, at *2 (W.D. Wash. Mar. 29, 2022) (citing *Baarslag v. Hawkins*, 531 P.2d 1283, 1285 (Wash. App. 1975)).  To carry its burden, the party must show that

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 21

both parties clearly "had knowledge of and assented to the incorporated terms[.]" *Ferrellgas*, 7 P.3d at 865 (alteration in original) (quoting 11 SAMUEL WILLISTON, THE LAW OF CONTRACTS § 30:25, at 234 (Richard A. Lord ed., 4th ed. 1999)).

Here, the Purchase Order expressly disclaims additional terms—and specifically any terms attached to Industrial Kiln's proposal. The Purchase Order states that "acceptance of this Order is expressly limited to the terms stated herein and the attached 'General Terms and Conditions' which have been negotiated, amended and agreed to by the parties[.]" Dkt. No. 47 at 40. The attached conditions, in turn, provide that "any additional … terms and conditions contained in, attached to[,] or referenced by [Industrial Kiln's] … proposal … or other document provided by [Industrial Kiln] will not be binding on [Ash Grove], will have no effect …[,] and are expressly rejected by [Ash Grove]" unless "expressly accepted in writing by an" Ash Grove "officer[.]" *Id.* at 41. Industrial Kiln has not presented any writing expressly accepting its hyperlinked terms and conditions.

In sum, the Purchase Order unequivocally disclaims an intent to incorporate Industrial Kiln's standard terms and conditions. Industrial Kiln's cross-motion must therefore rise or fall based on the terms of the Purchase Order that both parties agreed to.

2. The notice-and-cure provision

Turning to the substance of the cross-motion, Industrial Kiln contends that Ash Groves' counterclaims are barred because Ash Grove failed to give Industrial Kiln notice and an opportunity to cure before terminating the contract and pursuing legal remedies. Industrial Kiln relies on a provision titled "Cure Period" in the Purchase Order, which provides: "The period within which either party may cure any default in the performance of any of its obligations under

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 22

the agreement shall be 10 business days after receipt of written notice of default from the other party."[9]  Dkt. No 47 at 43.

According to Industrial Kiln, Ash Grove's termination of the contract without notice and an opportunity to cure constituted a material breach that precludes Ash Grove from enforcing any prior breaches by Industrial Kiln stemming from its work.  Dkt. No. 61 at 15.  For support, Industrial Kiln relies on the principle that "[a] party is barred from enforcing a contract that it has materially breached."  *Rosen v. Ascentry Techs., Inc.*, 177 P.3d 765, 767 (Wash. Ct. App. 2008) (citation omitted); *see* Dkt. No. 61 at 15 (citing *Parsons Supply, Inc. v. Smith*, 591 P.2d 821, 823 (Wash. Ct. App. 1979)).

A material breach is "one that substantially defeats the purpose of the contract."  *Park Ave. Condo. Owners Ass'n v. Buchan Devs., L.L.C.*, 71 P.3d 692, 698 (Wash. Ct. App. 2003) (quoting 6A WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 302.03, at 127 (1997)).  The significance of "materiality" in this context is that, unlike an ordinary breach, a material breach permits the nonbreaching party to terminate the contract and excuse itself of further contractual performance.  *Colo. Structures, Inc. v. Ins. Co. of the W.*, 167 P.3d 1125, 1133 (Wash. 2007); *see also Park Ave. Condo. Owners Ass'n*, 71 P.3d at 698 ("[A] material breach is one 'serious enough to justify the other party in abandoning the contract[.]'" (quoting 6A WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 302.03, at 127 (1997))).  Thus, a breach is material only if it "goes to the root or essence of the contract" such that the other party is justified in abandoning the contract. *DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 317 P.3d 543, 550 (Wash. Ct. App. 2014).  "[A] breach of contract is not material if substantial performance has been rendered."  *Churchill*

---

[9] If the default requires more than 10 days to cure, the provision only requires the defaulting party to begin curing within 10 days of the notice.  Dkt. No 47 at 43.

*v. Choe*, No. 37393–5–I, 1997 WL 190798, at *4 (Wash. Ct. App. Apr. 21, 1997).  Materiality and substantial performance are typically questions of fact.  *DC Farms*, 317 P.3d at 550.

The Court finds that material issues of fact exist as to whether any breach by Ash Grove in winding down the contract was material (and, indeed, whether there was any breach at all).  As explained above, by the time Industrial Kiln's crews went home, Ash Grove had paid the full budget price, including the sum of the change-of-work plans, plus several hundred thousand dollars, which Ash Grove contends reflects its 30% downpayment.  Unlike the caselaw on which Industrial Kiln relies, this is not a case where the breaching party terminated the contract mid-project, depriving the other party of the opportunity to complete the work and earn the remaining contract balance.  *See DC Farms*, 317 P.3d at 547, 553 (holding that wholesale purchaser materially breached supply agreement by terminating contract for the current crop year without providing notice and opportunity to cure); *Conway Constr. Co. v. City of Puyallup*, 490 P.3d 221, 226–28 (Wash. 2021) (holding city wrongfully terminated contract mid-project by unreasonably withholding satisfaction).  Under these circumstances, even assuming Ash Grove breached the contract by demobilizing Industrial Kiln without providing notice and an opportunity to cure, there is at least a triable issue on whether the breach was material.

For these reasons, the Court will deny Industrial Kiln's cross-motion to the extent it seeks dismissal of Ash Grove's counterclaims based on the notice-and-cure provision.

3.  The limitation-of-remedies provision

Next, Industrial Kiln requests summary judgment limiting Ash Grove's available damages to the approximately $1.8 million Ash Grove paid under the contract.  The contract's limitation-of-remedies clause provides that Ash Grove's "sole remedy for the correction of any nonconforming work, materials, services[,] or goods shall be the repair or replacement thereof.  In the event that repair or replacement is not achieved or otherwise is an ineffective remedy, [Ash

Grove's] sole and exclusive additional remedy is the right to recover an amount not to exceed the amount paid to [Industrial Kiln] for the nonconforming work, material, services[,] or goods." Dkt. No. 47 at 43.

Ash Grove concedes that the limitation-of-remedies clause caps its damages for the costs of correcting allegedly nonconforming work, such as hiring third-party contractors to repair defective welds. *See* Dkt. No. 64 at 41 ("Ash Grove is not seeking more than it paid for costs related to correction of the work."). But it contends that its claims for business interruption damages are not a "remedy for the correction of" defects and are thus not subject to the limitation-of-remedies clause. *Id.* Considering the text of the clause and its context within the Purchase Order, the Court agrees with Ash Grove's interpretation.

In construing contract language, the Court must attempt "to give meaning and effect to all provisions." *Pac. Lutheran Univ. v. Certain Underwriters at Lloyd's*, 541 P.3d 358, 365 (Wash. 2024). Thus, the Court assumes the parties had a specific intent when they drafted the limitation-of-remedies clause to apply to "remedies for the correction of … nonconforming work, materials, services[,] or goods[.]" Dkt. No. 47 at 43. Construing this phrase to include business interruption damages would make little sense here. If a defective weld were to interrupt a customer's business, paying the customer for the interruption would not "correct" the weld (only paying a welder to fix it would). And because business interruption could never be "corrected" by the "repair or replacement" of the defective work, it is unlikely the parties intended to make business interruption damages contingent on Ash Grove asking Industrial Kiln to first attempt repair or replacement. *Id.*

Moreover, had the parties intended the clause to apply to all damages claims—or to business interruption damages in particular—they could easily have drafted it to achieve this. Indeed, Industrial Kiln's standard terms and conditions contain a clause that does just that by providing:

> Except for … repair, replacement[,] or refund, [Industrial Kiln] shall not be liable for *any* loss, injury, expense[,] or damage *caused by or resulting from* the equipment or other goods or services[,] whether caused by defect, failure[,] or malfunction and *whether a claim of such damage is based upon warranty, contract, negligence*[,] *or other theory*.

Dkt. No. 60-18 at 2 (emphasis added). Instead, the parties adopted the narrower limitation-of-remedies provision in the Purchase Order, which, by its plain terms, applies only to remedies for the correction of nonconforming work, materials, services, or goods.

Context bolsters the conclusion that this clause does not include business interruption damages, which are dealt with more specifically in a subsequent provision. Courts interpret "particular language" in a contract "in the context of other contract provisions." *Viking Bank v. Firgrove Commons 3, LLC*, 334 P.3d 116, 120 (Wash. Ct. App. 2014) (citing *Weyerhaeuser Co. v. Com. Union Ins. Co.*, 15 P.3d 115, 124 (Wash. 2000)). The provision immediately following the limitation-of-remedies clause addresses limits on "indirect, incidental, [or] consequential damages" including "loss of profits" and "business interruption[.]" Dkt. No. 47 at 43 ¶ 23. And that provision contains no indication that such damages are limited to the purchase price of the project. Instead, as discussed further below, it limits consequential damages to the amount covered by the breaching party's applicable insurance. *Id.*

Considering the provision's text and the more specific language in the clause that follows, the Court concludes that the limitation-of-remedies provision applies to remedies aimed at repairing or replacing defective work, materials, services, or goods, but not to claims for business interruption damages. The Court will therefore deny Industrial Kiln's summary judgment motion to the extent it seeks to limit Ash Grove's business interruption damages to the $1.8 million it paid.

4. The limitation-of-damages provision

Finally, Industrial Kiln seeks summary judgment dismissing Ash Grove's claims to the extent they seek consequential damages—in particular, Ash Grove's claim for roughly $3.6

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 26

million in business interruption damages.  Ash Grove alleges this amount reflects the profits it lost while the plant was shut down due to delays attributable to Industrial Kiln.  *See* Dkt. No. 67 at 86.

Industrial Kiln's motion largely relies on a provision in its standard terms and conditions that broadly disclaims liability for consequential damages.  Dkt. No. 61 at 18 (citing Dkt. No. 60-18).  But, as discussed above, the Purchase Order does not incorporate Industrial Kiln's standard terms and conditions; so, that provision is inapplicable.

The Purchase Order contains its own "limitation of damages" clause that generally forecloses "indirect, incidental, consequential[,] or punitive damages," including "business interruption" damages.  *See* Dkt. No. 47 at 43.  But that clause contains an important carveout that permits such damages "to the extent of the covered loss payable by [the breaching] party's applicable insurance[.]"[10]  *Id.*  Email correspondence between the parties and their attorneys indicates this language was specifically negotiated.  *See* Dkt. No. 69 at 4–5.

At oral argument, Industrial Kiln's counsel acknowledged that the contract permits consequential damages up to a party's insurance limits.[11]  The Court finds that Ash Grove raises a genuine issue for trial as to whether its asserted business interruption damages are a "covered loss" under Industrial Kiln's applicable insurance.  Ash Grove submitted a copy of Industrial Kiln's commercial insurance policy with The Charter Oak Fire Insurance Company.  Dkt. No. 65 at 93–

---

[10] The limitation-of-damages clause provides, in relevant part:

> Except to the extent of the covered loss payable by such party's applicable insurance, in no event shall either party or its affiliates be liable to the other party for any indirect, incidental, consequential[,] or punitive damages, nor for loss of business, loss of profits, loss of goodwill, or business interruption, whether such damages are classified as a direct damages or otherwise, arising out of or connected in any way with this agreement, whether arising out of breach of contract, warranty, or other theories of law.

Dkt. No. 47 at 43.

[11] Industrial Kiln argued, however, that consequential damages are nonetheless capped by the limitation-of-remedies provision—an argument the Court has rejected earlier in this order.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 27

274. It argues that the policy covers its business interruption damages because the policy covers "those sums that the insured becomes legally obligated to pay as damages *because of* … 'property damage.'" Dkt. No. 65 at 196 (emphasis added). According to Ash Grove, the interruption to its business was caused by property damage that resulted from the kiln drop, which caused the plant to remain shut down for weeks longer than anticipated.[12] Dkt. No. 64 at 34.

Industrial Kiln's reply does not present its own interpretation of the insurance policy and instead falls back in its position (rejected earlier) that business interruption damages are, in any event, capped at $1.8 million by the limitation-of-remedies provision. Because Ash Groves raises a genuine issue for trial as to whether its business interruption damages are covered by Industrial Kiln's insurance, the Court will deny the cross-motion to the extent it seeks dismissal of Ash Grove's claims for consequential damages.

### III.   CONCLUSION

For the reasons above, Ash Grove's motion for summary judgment is GRANTED. Dkt. No. 46. Industrial Kiln's claims in this matter are DISMISSED with prejudice. Industrial Kiln's cross-motion for summary judgment is DENIED. Dkt. No. 61.

Dated this 10th day of June, 2026.

Kymberly K. Evanson
United States District Judge

---

[12] Industrial Kiln's policy excludes coverage for certain damages resulting from ongoing operations and for damage to the insured's finished work. *See* Dkt. No. 65 at 200. While Ash Grove's brief analyzes these exclusions and argues they do not apply (Dkt. No. 64 at 36–39), Industrial Kiln does not respond with its own analysis or otherwise dispute Ash Grove's interpretation (*see* Dkt. No. 74).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 28